UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA



FILED

SEP 2 9 2011

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

HERCULES INCORPORATED; *and*
GEO SPECIALTY CHEMICAL, INC.;

        Defendants.

Civ. No.   2:11cv531

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States

and through the undersigned attorneys, acting at the request of the Administrator of the United

States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

### STATEMENT OF CASE

1.      This is a civil action brought pursuant to Section 311(b)(7) of the Clean Water

Act ("CWA"), 33 U.S.C. § 1321(b)(7), Section 3008 of the Resource Conservation and Recovery

Act ("RCRA"), 42 U.S.C. § 6928, and Section 326 of the Emergency Planning and Community

Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11046.

### JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this

action because it arises out of Sections 301 and 311(j) of the CWA, 33 U.S.C. §§ 1311 and

1321(j); Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); and Section 325(c)(4) of EPCRA, 42

U.S.C. § 11045(c)(4).

3.    This Court also has jurisdiction over this action, in which Plaintiff, the United States, seeks the imposition of civil penalties against Defendants, pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Section 309(b) of the CWA, 33 U.S.C. § 1319(b), provides that a civil action may be brought "in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and require compliance."

5.    Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), provides that a civil penalty action for violations of Section 311 of the CWA may be brought "in the district court of the United States for the district in which the defendant is located, resides, or is doing business, and such court shall have jurisdiction to assess such penalty."

6.    Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4), provides that the EPA may commence an action to impose a penalty for a violation of Sections 312 and 313, 42 U.S.C. §§ 11022 and 11023, in the district court for the district in which the defendant resides or where the defendant's principal place of business is located.

7.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1395(a), because Defendants operate or operated manufacturing units at the Franklin Plant in Courtland, Virginia and do or did business within the District; and because the violations occurred within the District.

8.    The authority to bring this action is vested in the United States Department of Justice under 33 U.S.C. § 1366 and 28 U.S.C. §§ 516 and 519.

## NOTICE

9.    In accordance with Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2), the Commonwealth of Virginia has been notified of the commencement of this action.

## DEFENDANT

10.    Defendant Hercules Incorporated ("Hercules") is a Delaware corporation doing business in Virginia.

11.    Defendant GEO Specialty Chemicals, Inc. ("GEO") is an Ohio corporation engaged in chemical manufacturing with a principal place of business located at 28601 Chagrin Boulevard, Suite 210, Cleveland, Ohio.

12.    Defendants are each a "person" within the meaning of Section 502 of the Clean Water Act, 33 U.S.C. § 1362(5), Section 1004 of RCRA, 42 U.S.C. § 6903(15), and Section 329(7) of EPCRA, 42 U.S.C. § 11049(7).

## STATUTORY BACKGROUND

### The Resource Conservation and Recovery Act

13.    Congress enacted the Resource Conservation and Recovery Act in 1976 to amend the Solid Waste Disposal Act of 1965. Pub. L. No. 94-580 §§ 1-2. Later, the Hazardous and Solid Waste Amendments of 1984 amended both prior acts. *See generally* Pub. L. No. 98-616. The three acts are collectively known as "RCRA" and exist in the U.S. Code at 42 U.S.C. §§ 6901-92k.

14.    Subtitle C of RCRA authorizes regulation of hazardous wastes.

15.    Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, the EPA may authorize states to implement a hazardous waste program in lieu of the federal program.

16.    Virginia has received federal authorization to administer a Hazardous Waste Management Program (the "Virginia Hazardous Waste Management Program") in lieu of the federal hazardous waste management program established under RCRA Subtitle C, 42 U.S.C. §§ 6921-6939e.

3

17.    The Virginia Hazardous Waste Management Regulations ("VaHWMR"), as codified at VaHWMR §§ 1.0 et seq. (1984), were authorized, effective December 18, 1984 (49 Fed. Reg. 47391 (December 4, 1984)), by the EPA pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), and 40 C.F.R. Part 271, Subpart A, and subsequently were re-authorized effective: August 13, 1993 (58 Fed. Reg. 32885 (June 14, 1993)); September 29, 2000 (65 *Fed. Reg.* 46607 (July 31, 2000)), as amended, and codified in 9 VAC 20-60-12 *et seq.* (1999); and June 20, 2003 (68 *Fed. Reg.* 36925 (June 20, 2003)).

18.    With certain exceptions, the VaHWMR incorporate definitions and adopt specific provisions of Title 40 of the Code of Federal Regulations (July 2001 edition) by reference. *See* 9 VAC 20-60-14, -18, and -260 through -279. This Complaint addresses violations, by the Respondents, of RCRA and of the federally authorized Virginia Hazardous Waste Management Program. For convenience, all citations are to the federal hazardous waste management regulations set forth at 40 C.F.R. Parts 260 – 279 unless otherwise noted.

19.    The provisions of the Virginia hazardous waste management program, by virtue of EPA authorization, have become requirements of Subtitle C of RCRA and are enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), in lieu of the analogous provisions of the federal regulations.

### Regulation of Oil under the Clean Water Act

20.    Section 311(b)(1) of the CWA established the policy prohibiting any discharges of oil into or upon the navigable waters of the United States or their adjoining shorelines. 33 U.S.C. § 1321(b)(1).

21.    Section 311(a)(1) of the CWA defines "oil" as: "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 1321(a)(1).

4

22.     Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States or adjoining shorelines in such quantities that have been determined may be harmful to the public health or welfare or the environment of the United States.

23.     For purposes of Section 311(b)(3) of the CWA, a discharge of oil into or upon the navigable waters of the United States in a quantity which may be harmful to the public health or welfare or the environment of the United States is a discharge of oil that causes a film or a sheen upon, or discoloration of, the surface of the water or adjoining shorelines, or causes a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines.

## Spill Prevention, Control and Countermeasure Regulations

24.     In Section 311(j)(1)(C) of the CWA, Congress required the President to promulgate regulations which would, among other things, establish procedures, methods, and equipment requirements to prevent discharges of oil and hazardous substances from onshore facilities into navigable waters and for containing such discharges. 33 U.S.C. § 1321(j)(1)(C).

25.     Section 501(a) of the CWA grants the President the general authority to promulgate regulations necessary to carry out these functions under the CWA. 33 U.S.C. § 1361(a).

26.     The President delegated the responsibility to promulgate the regulations for non-transportation-related onshore facilities to the Administrator of the EPA in Section 1, Paragraph 4 of Executive Order 11735 (August 3, 1973), and in Section 2(b)(1) of Executive Order 12777 (October 18, 1991).

27.     In 1973, the Administrator promulgated the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

5

28.    Under the Oil Pollution Prevention Regulations, "oil" is defined as:

[O]il of any kind or in any form, including, but not limited to: fats, oils, or greases
of animal, fish or marine mammal origin; vegetable oils, including oils from
seeds, nuts, fruits or kernels; and, other oils and greases, including petroleum, fuel
oil, sludge, synthetic oils, mineral oils, oil refuse, or oil mixed with wastes other
than dredge spoil.

40 C.F.R. § 112.2.

29.    The Oil Pollution Prevention Regulations apply to owners or operators of non-

transportation-related onshore and offshore facilities engaged in drilling, producing, gathering,

storing, processing, refining, transferring, distributing or consuming oil or oil products, which

store at least 1,320 gallons of oil above-ground or 42,000 gallons below-ground, and which, due

to their location, could reasonably be expected to discharge oil in harmful quantities, as defined

in 40 C.F.R. Part 110, into or upon navigable waters of the United States or adjoining shorelines

(collectively, "Part 112 Facilities"). 40 C.F.R. §§ 112.1(b) and (d).

30.    Section 112.3 requires that the owners and operators of certain Facilities prepare

Spill Prevention, Control and Countermeasure ("SPCC") Plans in writing, in accordance with 40

C.F.R. § 112.7, which contains detailed guidelines for preparing and implementing SPCC Plans.

40 C.F.R. § 112.3.

31.    Section 112.5 requires facility owners and/or operators to amend their SPCC

Plans whenever a change in facility design, construction, operation, or maintenance materially

affects a facility's ability to discharge oil into or upon navigable waters or adjoining shorelines.

40 C.F.R. § 112.5(a).

### Facility Response Plan ("FRP") Regulations

32.    In 1990, Congress amended Section 311 of the CWA by enacting the Oil

Pollution Act of 1990 ("OPA"). Included in this amendment was Section 311(j)(5)(A), which

required the President to promulgate regulations which would mitigate potential harm caused by

6

vessels, and onshore and offshore oil facilities that, because of their location, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters of the United States or adjoining shorelines ("substantial harm facilities"). 33 U.S.C. § 1321(j)(5)(A).

33.    Congress directed the President to promulgate regulations requiring the owners or operators of substantial harm facilities to submit to the President a plan for responding to worst case oil discharges and the substantial threat of such discharges to be known as a Facility Response Plan ("FRP").

34.    In Section 2(d)(1) of Executive Order 12777 (October 18, 1991), the President delegated to the Administrator of the EPA the authority to promulgate such regulations under Section 311(j) of the CWA for non-transportation-related onshore facilities.

35.    Pursuant to Section 311(c)(1)(C) and 311(j)(5)(A) of the CWA, 33 U.S.C. §§ 1321(c)(1)(C) and 1321(j)(5)(A), and the President's delegation of authority, in 1994 the Administrator of the EPA amended 40 C.F.R. Part 112 by promulgating additional oil spill response regulations, known as the FRP regulations, applicable to certain facilities, including those with a storage capacity of 1 million gallons of oil or greater, or 42,000 gallons of aboveground oil storage engaged in over-water transfers. 40 C.F.R. § 112.20.

36.    Pursuant to the FRP regulations, the owner or operator of a substantial harm facility is required to prepare and submit an FRP to the EPA. 40 C.F.R. § 112.20.

37.    In 2002, the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112 were amended. The implementation deadline for the 2002 amendments for existing facilities subsequently was extended to October 31, 2007. 40 C.F.R. § 112.3(a). The implementation deadline was again extended to July 1, 2009, 72 Fed. Reg. 27443 (May 16, 2007), then to

7

November 10, 2010, 74 Fed. Reg. 29136 (June 13, 2009), and then to November 11, 2011, 75 Fed. Reg. 63093 (October 14, 2010).

38.     Oil storage facilities in operation prior to August 16, 2002, such as the Franklin Plant, specifically were required to maintain their existing SPCC plans and remain in compliance with all preexisting regulatory requirements prior to the implementation deadline for the amended regulations pursuant to 40 C.F.R. § 112.3(a).

### The Emergency Planning and Community Right-to-Know Act ("EPCRA")

39.     Section 312 of EPCRA, 42 U.S.C. § 11022, as implemented by 40 C.F.R. Part 370, requires an owner or operator of a facility that is required to prepare or have available a Material Safety Data Sheet ("MSDS") for a hazardous chemical in accordance with the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 *et seq.*, and regulations promulgated under that Act at 29 C.F.R. § 1910.1200, and which has a quantity of that hazardous chemical at the facility at any one time during a calendar year in excess of the minimum reporting threshold established by 40 C.F.R. § 370.20(b), to prepare and submit an emergency and hazardous chemical inventory form ("inventory form") to the appropriate State Emergency Response Commission ("SERC"), Local Emergency Planning Committee ("LEPC"), and the local fire department.

40.     Pursuant to Section 312(a)(2) of EPCRA, 42 U.S.C. § 11022(a)(2), the inventory form containing Tier I information as described in Section 312(d)(1) of EPCRA, 42 U.S.C. § 11022(d)(1), must have been submitted to the SERC, LEPC and local fire department before March 1, 1988, must be submitted each subsequent year by March 1, and must contain data for the prior calendar year.

41.     Upon request by the SERC, LEPC, or local fire department, the owner or operator shall provide additional "Tier II" information, including, in part, estimates in ranges of the

8

maximum amount and daily amount of the hazardous chemical present at the facility during the prior calendar year, a brief description of the manner in which the chemical is stored, and the location of the chemical at the facility, as provided by Section 312(d)(2) of EPCRA, 42 U.S.C. § 11022(d)(2).

42.    Section 313 of EPCRA, 42 U.S.C. § 11023, requires the owner or operator of a facility that: (1) has 10 or more full-time employees; (2) is in a primary Standard Industrial Classification (SIC) Code 20 through 39 or other SIC or industry code as set forth in 40 C.F.R. § 372.22(b); and (3) manufactured, processed or otherwise used a toxic chemical listed in 40 C.F.R. § 372.65 in excess of the threshold quantity established in Section 313(f) of EPCRA, 42 U.S.C. § 11023(f), during the calendar year for which the form is required, to complete a a toxic chemical release form ("Form R") or alternate threshold report ("Form A") for each toxic chemical and submit the appropriate form to the EPA and the state in which the facility is located, by July 1 of the following calendar year.

43.    Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 372.3 define "facility" to mean, in relevant part, all buildings, equipment, structures and other stationary items that are located on a single site that are owned or operated by the same person (or by any person which controls, is controlled by, or under common control by such person).

44.    The EPA uses the data on chemical releases from each facility to prepare a publicly-available database known as the Toxic Release Inventory ("TRI").

## GENERAL ALLEGATIONS

### The Franklin Plant

45.    The Franklin Plant (the "Facility") is located at 21123 Shady Brook Trail near the intersection of State Highways 650 and 671 about three miles west of the town of Franklin, Virginia.

9

46.     The Franklin Plant is situated on approximately 120 acres of land owned by Hercules Incorporated ("Hercules").

47.     Other companies own certain production equipment located at the Franklin Plant.

48.     The Franklin Plant is bordered by State Route 671 to the north, the Nottoway River to the west, the main rail line to the south, and both the Wills Gut, a tributary of the Nottoway River, and a rail spur to the east.

49.     A rail spur runs from the main rail line along the east side of the Franklin Plant and is used by the Franklin Plant as a rail car unloading area and rail car storage area. In addition to the eastern rail spur, another rail spur extends from the main trunk line into the center of the Franklin Plant.

50.     The Franklin Plant is less than one-quarter mile from the banks of the Nottoway River.

51.     The Nottoway River is a navigable water of the United States and a perennial tributary of the Chowan River.

### The EPA's Investigation of the Franklin Plant

52.     The EPA conducted a comprehensive, multimedia inspection of the Franklin Plant between April 5, 2005 and April 15, 2005. EPA personnel inspected the physical plant of the Franklin Plant, including each of the manufacturing units. The EPA interviewed employees at the Franklin Plant, including employees of Hercules and GEO, industrial practices and processes at the Franklin Plant. The EPA reviewed various documents relating to the operations at the Franklin Plant, including the "Shared Facility Agreement" (SFA) and the "Integrated Contingency Plan" (ICP).

53.    The EPA followed up its initial inspection of the Franklin Plant by sending information request letters to Defendants and other companies on February 2, 2006 with respect to various operations associated with the Franklin Plant.

54.    On April 18, 2006, the EPA visited, for the purpose of inspecting rail cars, a facility in Deepwater, New Jersey (the "New Jersey TSD Facility") that received for final disposal the railcar deliveries of hazardous waste generated at the Franklin Plant. The EPA obtained samples of the contents of the rail cars at the New Jersey TSD Facility.

55.    The EPA returned to the Franklin Plant between April 19, 2006 and April 27, 2006 to take additional samples from a rail car used for the shipment of hazardous waste for off-site disposal. The rail car had been recently returned by the New Jersey TSD Facility and was being stored as though it were empty.

### Industrial Operations at the Franklin Plant

56.    At the time of the EPA's inspection of the Franklin Plant, there were four primary industrial units operating at the Facility: (1) the Crude Tall Oil Fractionation Unit; (2) the Aquapel Process Unit; (3) the Pamolyn Process Unit; and (4) the Vul-Cup Process Unit.

57.    Hercules originally used the Facility for the fractionation of crude tall oil.

58.    Crude tall oil is a byproduct of wood pulp, generated by pulp and paper mills.

59.    The Crude Tall Oil Fractionation Unit consisted of a crude tall oil tank farm in the northwest corner of the Facility and a processing area on the west side of the Facility.

60.    The Crude Tall Oil Fractionation Unit separated crude tall oil into different refined outputs.

61.    The Crude Tall Oil Fractionation Unit generated a wastewater, which was treated in an on-site Wastewater Treatment Facility ("WWTF") located in the southwestern corner of the Facility.

11

62.    In 2001, Eastman Chemical Resins, Inc. ("Eastman") acquired ownership of certain equipment associated with the Crude Tall Oil Fractionation Unit from Hercules, but Hercules continued to own the land on which the Crude Tall Oil Fractionation Unit was located.

63.    Eastman also purchased from Hercules in 2001 certain equipment associated with the Franklin Plant's WWTF, the power generation unit, and the Pamolyn Process Unit, but Hercules continued to own the land on which all of this equipment was located.

64.    In or around 2008, Eastman shut down the Crude Tall Oil Fractionation Unit.

65.    Since 1965, Hercules has operated the Aquapel Process Unit at the Facility, which is located on the eastern side of the Facility between the two rail spurs.

66.    The Pamolyn Process Unit is located in the southeastern corner of the Franklin Plant between the eastern rail spur and the Facility's central rail spur.

67.    The Pamolyn Process Unit produces compounds that are sold as feedstock chemicals to manufacturers of lubricants, paints and food products.

68.    In 1971, Hercules introduced the Vul-Cup Process Unit.

69.    The Vul-Cup Process Unit is located in the northeastern corner of the Franklin Plant.

70.    In 2001, GEO acquired certain equipment associated with the Vul-Cup Process Unit from Hercules, but Hercules retained ownership of the land on which the Vul-Cup Process Unit was located.

71.    On or about February 17, 2009, GEO divested itself of its assets related to the Franklin Plant, including the Vul-Cup Process Unit.

72.    Wastewater generated in process units at the Franklin Plant is discharged to the Nottoway River through an outfall subject to a NPDES permit.

### The Canal

73.     Process wastewater at the Franklin Plant is discharged through a pipe, known as Outfall 002, into a canal ("Canal") located on the western side of the Facility.

74.     Hercules owns the Canal and the land on which it is located.

### The Shared Facility Agreement

75.     Hercules, Eastman and GEO manufactured their respective products at the Facility pursuant to one or more Shared Facility Agreements.

76.     Under the Shared Facility Agreement(s), Hercules supplied GEO and Eastman with certain services, including environmental services, at the Franklin Plant.

77.     Hercules employees perform work in connection with all operations at the Facility.

### Hazardous Waste Generation at the Franklin Plant

78.     Title 40, Part 262 of the Code of Federal Regulations provides regulations applicable to generators of hazardous waste.

79.     "Generator" for the purposes of those regulations means "any person, by site, whose act or process produces hazardous waste identified or listed in part 261 of this chapter or whose act first causes a hazardous waste to become subject to regulation." 40 C.F.R. § 260.10.

80.     Defendants were each a "generator" of 1,000 kilograms or more of hazardous waste per calendar month ("large quantity generator") with respect to the Franklin Plant.

81.     Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), authorized the EPA to promulgate regulations requiring that each owner or operator of a facility that treats, stores or disposes of hazardous waste obtain a permit or qualify for interim status for the facility.

82.     At no time relevant to this complaint did Hercules or GEO have a RCRA permit or interim status for the treatment, storage or disposal of hazardous waste at the Franklin Plant.

## COUNT I –DEFICIENT SPILL RESPONSE PLANS

83.    Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

84.    Section 112.20 of the Oil Pollution Prevention Regulations requires the owner or operator of a non-transportation related onshore oil storage facility having an aggregate above-ground storage capacity of equal to or greater than 1 million gallons, which, due to its location, could be reasonably expected to do substantial harm to the environment by discharging oil into navigable waters or onto adjoining shorelines, to prepare an FRP. 40 C.F.R. § 112.20(f)(1)(ii).

85.    From at least 2005 until at least 2008, (i) the Franklin Plant, and (ii) the Crude Tall Oil Fractionation Unit, were each "non-transportation related onshore oil storage facilities" with a storage capacity of greater than 1 million gallons.

86.    From at least 2005 until at least 2008, due to their location, (i) the Franklin Plant, and (ii) the Crude Tall Oil Fractionation Unit, could be reasonably expected to do substantial harm to the environment by discharging oil into navigable waters or onto adjoining shorelines.

87.    From at least 2005 until at least 2008, Herucles was an "owner" or "operator" of the Franklin Plant or the Crude Tall Oil Fractionation Unit.

88.    Pursuant to 40 C.F.R. § 112.20, Hercules was required to prepare an FRP.

89.    At all times relevant to this complaint, Defendants engaged in producing, gathering, storing, processing, refining, transferring, distributing, or consuming oil.

90.    Pursuant to 40 C.F.R. § 112.3 (2002), Defendants were required to prepare a SPCC Plan.

91.    A SPCC Plan must be a "carefully thought-out plan, in accordance with good engineering practices." 40 C.F.R. 112.7 (2002).

92.    A "description of the physical layout of a facility" is a general requirement for a SPCC Plan.

93.    Section 112.20(h) of the Oil Pollution Prevention Regulations requires that an FRP follow the format of the Model FRP attached as Appendix F to Part 112 or shall be an equivalent plan that contains the elements contained in that section. 40 C.F.R. § 112.20(h) (2002), as amended (2003).

94.    The Model FRP provides that an FRP facility must identify each tank containing oil or a hazardous substance at the facility and provide such information as the maximum capacity of the tank, its construction and its year of installation. 40 C.F.R. Part 112, Appendix F, "Hazard Identification," Section 1.4.1(1)-(3).

95.    The Model FRP states that the facility diagrams should include and identify the contents and capacities of all bulk oil storage tanks and drum oil storage areas. 40 C.F.R. Part 112, Appendix F, "Diagrams," Section 1.9.

96.    Section 112.20(h)(9) of the Oil Pollution Prevention Regulations requires the FRP to include diagrams of the facility. 40 C.F.R. § 112.20(h)(9).

97.    In lieu of preparing separate FRP and SPCC plans, Defendants utilized a single integrated contingency plan ("ICP") for the Franklin Plant.

98.    The ICP included an inventory of oil storage tanks and containers at Tables A1-1 through A1-5.

99.    The ICP failed to identify the following oil storage tanks and containers in use at the Franklin Plant: four above-ground storage tanks (T-306, T318, T-320, T-302) used for the storage of heptane and heptane mixtures; several transformers containing mineral oil located throughout the Franklin Plant; two 300-gallon fatty acid reclamation vats in the Pamolyn Process Unit; and several 55-gallon drums of oils located around the Facility.

100.   Because the ICP did not include a complete listing of all of the oil storage tanks and drums at the Franklin Plant, it failed to comply with 40 C.F.R. §112.20(h).

101.   Because the ICP did not identify all of the oil storage containers in use at the Franklin Plant, the ICP did not constitute a proper SPCC Plan consistent with "good engineering practices" and failed to comply with 40 C.F.R. § 112.7.

102.   Defendants' failures to comply with 40 C.F.R. §§ 112.7 and/or 112.20(h) constitute separate violations of regulations issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

103.   Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT II – FAILURE TO IMPLEMENT FRP

104.   Paragraphs 1 through 103 are incorporated by reference as if fully set forth herein.

105.   Pursuant to Section 112.21(a) of the Oil Pollution Prevention Regulations, 40 C.F.R. § 112.21(a), Hercules was required to conduct emergency response training drills on at least an annual basis.

106.   Pursuant to Section 112.21(b) and (c), 42 U.S.C. § 112.21(b) & (c), Hercules, was required to implement a training program and a program of drills and exercises that followed the U.S. Coast Guard's Training Elements for Oil Spill Response and the National Preparedness for Response Exercise Program ("PREP"), unless the EPA specifically approved an alternative program for a facility.

107.   The EPA did not approve an alternative program for the Franklin Plant.

108. Upon information and belief, from at least 2005 until at least 2006, Hercules did not complete all of the training, drills, and/or exercises.

109. Hercules's failure to perform the required training, drills, and/or exercises violates 40 C.F.R. § 112.21, a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

110. Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT III –UNLAWFUL DISCHARGES OF OIL

111. Paragraphs 1 through 110 are incorporated by reference as if fully set forth herein.

112. Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States or adjoining shorelines in such quantities that have been determined may be harmful to the public health or welfare or the environment of the United States.

113. The Franklin Plant and the Canal are onshore facilities within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10).

114. At all times relevant to this complaint, each Defendant was an owner or operator of the Franklin Plant or the Canal.

115. Oil, as defined by Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and 40 C.F.R. § 112.2, has been discharged, within the meaning of Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2), in harmful quantities, as defined by 40 C.F.R. § 110.3, from the Franklin Plant and from the Canal into navigable waters of the United States.

### August 17-22, 2005 Oil Spill

116.    Between August 17 and August 22, 2005, at least 100 pounds of a mixture of crude tall oil and fatty acids were discharged from the Franklin Plant's Wastewater Treatment Facility through the Canal.

117.    Crude tall oil and fatty acids are "oils" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1) and 40 C.F.R. § 110.3.

118.    Oil from this release was found as far as one-half mile downstream in the Nottoway River.

119.    The amount of oil discharged in the Nottoway River between August 17 and 22, 2005, was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### December 16, 2005 Oil Spill

120.    On December 16, 2005, as much as 20 gallons of diisopropylbenzene ("DIB") that, on information and belief, originated in the Vul-Cup Process Unit, were discharged through the Canal into the Nottoway River.

121.    DIB is an "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1) and 40 C.F.R. § 110.3.

122.    The discharge of DIB on December 16, 2005 killed fish in the Nottoway River.

123.    The amount of oil discharged in the Nottoway River on December 16, 2005, was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### July 17, 2006 Oil Spill

124.    On July 17, 2006, approximately 4 gallons of tall oil were released from the Franklin Plant into the Nottoway River.

125.    Tall oil is an "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1) and 40 C.F.R. § 110.3.

126.    The amount of oil discharged on July 17, 2006 was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### August 31, 2007 Oil Spill

127.    At approximately midnight on August 31, 2007, an unknown quantity of fatty acid was released from the Franklin Plant into the Nottoway River.

128.    The fatty acid created a whitish sheen on the surface of the Nottoway River.

129.    The quantity of oil discharged on August 31, 2007 was a harmful quantity of oil as defined by 40 C.F.R. § 110.3.

### November 6, 2007 Oil Spill

130.    On November 6, 2007, approximately 10 gallons of tall oil and fatty acid were released from the Franklin Plant into the Nottoway River.

131.    The amount of oil discharged on November 6, 2007 was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### Liability for the Above Spills

132.    Defendants, as owners or operators of a facility that discharged oil in a harmful quantity into a navigable water of the United States, are liable for violations of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

133.    Section 311(b)(7)(A) of the CWA provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7)(A). The Civil Monetary Penalty Inflation Adjustment Rule increased this penalty to $32,500 per day or $1,100 per barrel for spills occurring after March 15, 2004. 40 C.F.R. § 19.4.

## COUNT IV – INADEQUATE SECONDARY CONTAINMENT

134.    Paragraphs 1 through 133 are incorporated by reference as if fully set forth herein.

135.    Section 112.7(c) of the Oil Pollution Prevention Regulations addresses appropriate containment and/or diversionary structures and equipment to be used by an oil storage facility to contain oil spills and prevent the migration of oil into navigable waters and adjacent shorelines. 40 C.F.R. § 112.7(c).

136.    Any containment system must be capable of containing oil until the spill is cleaned up. 40 C.F.R. § 112.7(c).

### Automatic Sump

137.    At the time of the 2005 inspection, there were two tank farms in the Crude Tall Oil Fractionation Unit with a total oil storage capacity of approximately 3,330,786 gallons.

138.    The northern tank farm was surrounded by a containment barrier and was linked to the southern tank farm by an automatic pump and a drain pipe.

139.    Eastman's southern tank farm was surrounded by a secondary containment dike, which had a 379,500 gallon capacity.

140.    Hercules was an owner or operator of the Franklin Plant or the Crude Tall Oil Fractionation Unit, including the northern and southern tank farms.

141.    During the April 2005 inspection, EPA personnel observed a sump equipped with an automatic pump inside the area surrounded by the southern tank farm's containment dike. The sump pumped liquids to the 2,300 gallon wet well in the WWTF, which discharged effluent to the Outfall 002 Canal.

142.    Section 112.7(c)(1)(i) requires that a containment dike be "sufficiently impervious to contain oil." 40 C.F.R. § 112.7(c)(1)(i).

20

143.    A containment dike with an automatic sump providing a pathway beyond the walls of the dike is not "sufficiently impervious to contain oil."

144.    On information and belief, under the physical configuration of the Facility as of the 2005 inspection, oil released from certain-sized spills in the Crude Tall Oil Fractionation Unit tank farms would migrate via the automatic sump through the WWTF, to the Canal and into the Nottoway River.

145.    Due to the presence of a sump with an automatic pump in the southern tank farm, the linked northern and southern tank farms did not constitute containment dike systems which are "sufficiently impervious to contain spilled oil" in accordance with 40 C.F.R. § 112.7(c)(1)(I).

### GEO Rail Car Unloading Rack

146.    From at least 2005 until at least 2008, GEO received deliveries of approximately 180,000 pounds of an oil derivative by railcar every month. Each railcar tank had a capacity of approximately 24,000 gallons.

147.    The oil derivative deliveries were unloaded at an rail car unloading rack on Track 3, Spot 1 on the eastern rail spur.

148.    Each Defendant was an "owner" or "operator" of the rail car unloading rack.

149.    The unloading rack area is surrounded by a concrete pad and curb with a containment capacity of approximately 2,000 gallons.

150.    As a refined petroleum product, the oil derivative falls within the definition of "petroleum oil" at 40 C.F.R. § 112.2.

151.    Oil from a spill exceeding 2,000 gallons likely would flow into the eastern drainage ditch leading to Outfall 003 and then to the Nottoway River.

152.    Pursuant to a 40 C.F.R. § 112.7(e)(4)(ii), a loading/unloading rack at an oil storage facility is required to have secondary containment with a capacity at least equal to the capacity of the largest single compartment of any vehicle using the rack. .

153.    The rail car unloading rack failed to have secondary containment sufficient to contain at least 24,000 gallons as required by 40 C.F.R. § 112.7(e)(4)(ii).

### Aquapel Process Unit Unloading Racks

154.    Hercules's Aquapel Process Unit receives shipments of fatty acids, which are oils, via railcar and tank truck. Each railcar tank has a capacity of approximately 24,000 gallons, while a tank truck has a 5,000 gallon capacity.

155.    Hercules unloads its railcars on Track 1 and 2, spots 8 and 9, which are equipped with concrete pads and curbs providing 750 gallons of containment capacity.

156.    Hercules is an owner and an operator of the rail car unloading rack for the Aquapel Process Unit.

157.    The truck unloading rack has a concrete pad with curbing providing a containment capacity of 500 gallons.

158.    The regulations in effect at the time of the EPA's April 2005 inspection required that loading/unloading racks at an oil storage facility have secondary containment with a capacity at least equal to the capacity of the largest single compartment of any vehicle using the rack. 40 C.F.R. § 112.7(e)(4)(ii).

159.    Hercules's railcar unloading rack on Track 1 and 2 had insufficient secondary containment as required by 40 C.F.R. § 112.7(e)(4)(ii).

160.    Hercules's truck unloading rack had insufficient secondary containment as required by 40 C.F.R. § 112.7(e)(4)(ii).

### Pamolyn Process Unit Unloading Rack

161.    At the time of the April 2005 inspection, an unloading rack adjacent to Tanks T-37 and T-38 in the Pamolyn Process Unit was used for the transfer of a fatty acid, which is an oil. This unloading rack lacked any secondary containment.

162.    Hercules was an "owner" or "operator" of the unloading rack.

163.    Hercules's failure to provide any secondary containment for this unloading rack violated 40 C.F.R. § 112.7(e)(4)(ii) (2002), as amended by 40 C.F.R. § 112.7(h)(1) (2003).

### New Drum Storage Area

164.    During the April 2005 inspection, EPA personnel observed that Hercules was storing approximately 25 55-gallon drums of oil on the south side of the Facility's Emergency Equipment Storage Shed located on the east side of the central portion of the Facility.

165.    The drums were situated on a concrete pad without any secondary containment and near a grated storm drain.

166.    The storm drain flows south into the South Ditch, which ultimately flows into the Outfall 002 Canal.

167.    Hercules is an "owner" or "operator" of the new drum storage area.

168.    The lack of secondary containment around the new drum storage area violated 40 C.F.R. § 112.7(c).

### Tank T-70

169.    During the April 2005 inspection, EPA inspectors noted that Tank T-70, a 500-gallon AST used to store diesel fuel, was not protected by any secondary containment.

170.    Hercules is an "owner" or "operator" of Tank T-70

171.    The lack of secondary containment, or other spill control devices, for Tank T-70, violated 40 C.F.R. § 112.7(c).

**Outfall 002 Canal**

172.    Defendants relied, at times relevant to this complaint, on the Canal as a containment structure for oil spills.

173.    At times relevant to this complaint, the ICP asserted that the Canal potentially provides as much as 215,000 gallons of secondary or tertiary containment for oils released at the Facility.

174.    From at least 2005 until at least 2008, Defendants relied upon the alleged containment volume provided by the Canal as providing secondary containment for a number of structures and pieces of equipment at the Franklin Plant, including but not limited to: (i) the Aquapel Process Unit unloading racks; and (ii) the GEO rail car unloading racks, which has four unloading spaces for railcars.

175.    Defendants claimed in the ICP that oils reaching the Outfall 002 Canal will be prevented from entering the Nottoway River by the dam and underwater baffle system installed in the Canal.

176.    Section 112.7(c) of the Oil Pollution Prevention Regulations, 40 C.F.R. § 112.7(c), requires that an owner or operator of an oil storage facility must provide an appropriate containment system to prevent the release of oil in harmful quantities to the waters of the United States. In the context of containment dikes and other physical barriers, this means that such structures must be sufficiently impervious so as to contain spilled oil.

177.    The Outfall 002 Canal is not impervious to the flow of fluids and does not constitute "impervious" containment.

178.    The Outfall 002 Canal does not comply with the requirements of 40 C.F.R. § 112.7(c) because it does not capture oils which flow into the Outfall 002 Canal in order to prevent the release of oils in harmful quantities to the Nottoway River.

179.    Since October 2002, the Franklin Plant has experienced several spills of oil during which harmful quantities of oil were discharged through the Outfall 002 Canal into the Nottoway River.

180.    The repeated releases of oil from Outfall 002 over successive years demonstrates that the dam and baffle system installed in the Canal is ineffective in preventing the movement of oil from the Canal into the Nottoway River.

181.    Because the Outfall 002 Canal is not an adequate secondary containment system, and the process units described above had no other secondary containment system, the Franklin Plant was not in compliance with 40 C.F.R. § 112.7(c).

### Liability for lack of secondary containment

182.    Defendants' failures to comply with 40 C.F.R. § 112.7 constitute violations of a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

183.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

### COUNT V – INSUFFICIENT PLANT LIGHTING

184.    Paragraphs 1 through 183 are incorporated by reference as if fully set forth herein.

185.    The Oil Pollution Prevention Regulations require facilities to have lighting sufficient to allow the detection and control of oil spills at night.  40 C.F.R. § 112.7(g)(5)(i) (2005).

186.    The Franklin Plant operates twenty-four hours per day, seven days a week.

187.    The nighttime operations at the Franklin Plant include the storage, use, and movement of oil through the facility and each of its process areas.

188.    During the April 2005 inspection, EPA personnel noted that the area surrounding Valve No. 2, which controls the flow from the southern drainage ditch into the Outfall 002 Canal, was completely unlit at night.

189.    EPA personnel also noted the absence of lighting in the vicinity of Valve No. 4 at Outfall 003 at night.

190.    The lack of lighting in the areas of Valves No. 2 and No. 4 would impede the night time detection of spilled oil in the southern and eastern drainage ditches, as well as the operation of Valves Nos. 2 and 4, which might be needed to capture oil originating from a significant portion of the Franklin Plant.

191.    The lack of lighting constitutes a violation of 40 C.F.R. 112.7(e)(9)(v), amended by 40 C.F.R. § 112.7(g)(5)(i).

192.    Defendants' failure to install proper lighting in the vicinities of Valves No. 2 and No. 4 in accordance with 40 C.F.R. § 112.7(g)(5)(i) (2005), constitutes a violation of a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

193.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C).  The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004.  40 C.F.R. §19.4.

## COUNT VI – FAILURE TO MAKE A HAZARDOUS WASTE DETERMINATION

194.    Paragraphs 1 through 193 are incorporated by reference as if fully set forth herein.

195.    At all times relevant to this Complaint, Hercules was an "owner" or "operator" the WWTF.

196.    The WWTF's Wet Well receives waste liquids and drainage from various production areas of the Franklin Plant, including the Car Wash Pit.

197.    The Wet Well discharges its contents to an oil-water separator known as S-100.

198.    Hercules periodically skimmed oils from S-100 and transferred them to a tank known as T-604.

199.    Hercules also periodically skimmed oils from the equalization tank, known as T-601, and the stormwater tank, known as T-605, and transferred the skimmed oils to T-604.

200.    The skimmed oils collected in T-604 were periodically transferred to tank T-7 or tank T-8.

201.    In addition to the skimmed oils transferred from T-604, T-7 received oil collected from certain other parts of the Franklin Plant.

202.    Oils collected in T-7 and T-8 were periodically transferred to tank P-3.

203.    Hercules periodically added Pamak, another oil, to tank P-3.

204.    The oils in tank P-3 were removed from P-3 and burned in one of three vaporizers at the Franklin Plant.

205.    The following are "solid wastes" as defined in 40 C.F.R. § 261.2:

      a.      the skimmed oils being collected from S-100;

      b.      the skimmed oils being collected from T-601;

      c.      the skimmed oils being collected from T-605;

      d.      the oils in T-7;

      e.      the oils in T-8; and

    f.  the oils in P-3.

206. Hercules is a "generator" of the solid wastes identified in Paragraph 205.

207. Pursuant to 40 C.F.R. § 262.11, "[a] person who generates a solid waste, as defined in 40 C.F.R. 261.2, must determine if that waste is a hazardous waste" using certain specified methods.

208. The EPA took two samples of the skimmed oils from S-100 in April 2006 and analyzed those samples in accordance with the Toxicity Characteristic Leaching Procedure ("TCLP") set forth in 40 C.F.R. § 261.24.

209. The two samples had concentrations of 6.69 ppm and 7.8 ppm of chromium.

210. A solid waste that contains chromium at concentrations greater than 5.0 ppm as determined by TCLP testing exhibits the characteristic of toxicity for chromium and is a hazardous waste.

211. The skimmed oils being collected from S-100 were hazardous waste characterized with EPA hazardous waste number D007.

212. Hercules violated 40 C.F.R. § 262.11 by failing to perform an adequate hazardous waste determination for the solid wastes identified in paragraph 205.

213. Hercules's failures to comply with 40 C.F.R. § 262.11 constitute violations of a regulation issued under Section 3002(a) of RCRA, 42 U.S.C. § 6922(a), which is enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

214. Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty

Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT VII – FAILURE TO CREATE AND/OR RETAIN SKIMMED OIL WASTE ANALYSIS

215.    Paragraphs 1 through 214 are incorporated by reference as if fully set forth herein.

216.    The skimmed oils collected from S-100 were hazardous waste because they exhibited the toxicity characteristic for chromium.

217.    The point at which oils were skimmed at tank S-100 constituted a point of generation for purposes of 40 C.F.R. Part 268.

218.    The hazardous waste oils skimmed from S-100 then moved through the Franklin Plant's WWTF, including to Tanks T-7, T-8, and P-3.

219.    In addition to the skimmed oils transferred from T-604, T-7 received oil collected from certain other parts of the Franklin Plant, constituting a point of generation for purposes of 40 C.F.R. Part 268.

220.    Oils in T-8 were treated, constituting a point of generation for purposes of 40 C.F.R. Part 268.

221.    Oils collected in T-7 and T-8 were periodically transferred to tank P-3.

222.    Hercules periodically added a commercial fuel oil to tank P-3, thereby constituting a point of generation for purposes of 40 C.F.R. Part 268.

223.    The oils in tank P-3 were removed from P-3 and burned in the vaporizers at the Franklin Plant.

224.    All or a portion of the waste from each of the locations identified in Paragraph 226 was subsequently burned in the Facility's vaporizers, thereby generating an ash which was then land disposed.

225. Pursuant to 40 C.F.R. § 268.7(a)(1), a generator of hazardous waste must determine if the waste has to be treated before it can be land disposed. This is done by determining whether the waste meets the treatment standards of 40 C.F.R. §§ 268.40, 268.45 or 268.49 and is known as a land disposal restriction ("LDR") waste determination. According to that section, this may be done by either testing the waste or using knowledge of the process by which the waste is generated, and, must identify any underlying hazardous constituents.

226. Hercules had no such LDR waste determination for each of the following waste streams in its on-site files:

  a. the skimmed oils being collected from S-100;

  b. the oils in T-7;

  c. the oils in T-8; and

  d. the oils in Tank P-3.

227. Hercules's failure to perform an LDR waste determination for each of the waste streams identified in Paragraph 226 constitutes separate violations of 40 C.F.R. § 268.7(a)(1).

228. Hercules's failures to comply with 40 C.F.R. § 268.7(a)(1) constitutes violations of a regulation issued under Section 3002(a) of RCRA, 42 U.S.C. § 6922(a), which is enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

229. Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT VIII – FAILURE TO REPORT STORAGE OF SULFURIC ACID

230.    Paragraphs 1 through 229 are incorporated by reference as if set forth fully herein.

231.    Hercules is an "employer" as that term is defined at 29 U.S.C. § 1910.1200(c) because it is engaged in a business where chemicals are either used, distributed, or produced for use or distribution.

232.    Hercules is the owner and operator of a facility that is required to prepare or have available an MSDS for hazardous chemicals under the OSHA Hazard Communication Standard, 29 U.S.C. §§ 651 et seq., and 29 C.F.R. § 1910.1200.

233.    Sulfuric acid is a "hazardous chemical" as defined by Section 311(e) of EPCRA, 42 U.S.C. § 11021(e), and as listed in 40 C.F.R. § 302.4.

234.    Sulfuric acid also is an "extremely hazardous substance" ("EHS") as defined in Section 329(3) of EPCRA, 42 U.S.C. § 11049(3), and 40 C.F.R. § 370.2, and as listed in 40 C.F.R. Part 355, Appendices A and B.

235.    Pursuant to 40 C.F.R. § 370.20(b)(1), the minimum threshold for reporting for extremely hazardous substances is the lesser of 500 pounds or the threshold planning quantity for that substance.

236.    At any one time during calendar years 2005 and 2006, Hercules had a maximum storage quantity of an estimated 847 pounds of sulfuric acid at the Franklin Plant.

237.    Upon information and belief, at any one time during calendar years 2005 and 2006, Hercules had present sulfuric acid, an EHS, in quantities exceeding its minimum reporting threshold at the Franklin Plant.

238.    Hercules was required to submit to the SERC, LEPC, and the local fire department the inventory form containing Tier I information as described in Section 312(d)(1) of

EPCRA, 42 U.S.C. § 11022(d)(1) every year by March 1, containing data for the prior calendar year.

239.    For calendar years 2005 and 2006, Hercules failed to submit to the SERC, LEPC, and the local fire department the required inventory form containing Tier I information by March 1 of the following year in violation of Section 312 of EPCRA, 42 U.S.C. § 11022.

240.    Each failure to submit an inventory form containing Tier I information, whether to the SERC, LEPC, or local fire department, for each year, constitutes a separate violation of Section 312 of EPCRA.

241.    Section 325 of EPCRA, 42 U.S.C. § 11045 provides for civil penalties of up to $25,000 per violation per day of Section 312 of EPCRA ($32.500 per day per violation after March 15, 2004 pursuant to 40 C.F.R. Part 19).

## COUNT IX – FAILURE TO RETAIN TOXIC RELEASE INVENTORY REPORT RECORDS

242.    Paragraphs 1 through 241 are incorporated by reference as if set forth fully herein.

243.    At all times relevant to this complaint, Hercules has been an owner or operator of a "facility" within the meaning of Section 329(4) of EPCRA, 42 U.S.C. § 11049(4).

244.    Hercules's Facility has ten or more full-time employees and it operates under SIC Code 2899, which falls within those SIC codes starting with 20 through 39, as set forth at 40 C.F.R. § 372.22(a) and (b).

245.    Hercules manufactures, processes, or otherwise uses, one or more "toxic chemicals," as defined by Section 313(c) of EPCRA, 42 U.S.C. § 11023(c), including but not limited to hydrochloric acid.

246.    Hydrochloric acid is a "toxic chemical" within the meaning of Section 313(c) of EPCRA, 42 U.S.C. § 11023(c), and 40 C.F.R. § 372.3, and listed in 40 C.F.R. § 372.65.

247.    The reporting threshold for hydrochloric acid is 10,000 pounds per annum as set forth in 40 C.F.R. § 372.25(b).

248.    From each calendar year from at least 2001 to at least 2003, Hercules released more than 10,000 pounds of hydrochloric acid to the atmosphere.

249.    Pursuant to Section 313 of EPCRA, 42 U.S.C. § 11023, Hercules was required to complete and submit a toxic chemical release form ("Form R") or alternate threshold report ("Form A") for hydrochloric acid to the EPA and the Commonwealth of Virginia by July 1 of the following calendar year for each year during which it manufactured, processed or otherwise used a toxic chemical listed in 40 C.F.R. § 372.65 in excess of the threshold quantity established in Section 313(f) of EPCRA, 42 U.S.C. § 11023(f).

250.    Hercules submitted "Form R" reports for the years 2001 through 2003 for hydrochloric acid released from the Facility.

251.    Pursuant to 40 C.F.R. § 372.10(a)(3), Hercules was required to maintain the materials and documentation supporting the Form R reports it submitted for 2001 through 2003 for a period of three years from the date of each submission.

252.    Hercules failed to maintain the records supporting its release estimates for hydrochloric acid for its Form R reports for at least the years 2001 through 2003 as required by 40 C.F.R. § 372.10(a)(3)(iii), which is enforceable through Section 325 of EPCRA, 42 U.S.C. § 11045.

253.    Each failure to maintain the materials and documents supporting the Form R reports constitutes a separate violation under EPCRA Section 313.

254.    Section 325 of EPCRA, 42 U.S.C. § 11045(c)(1) provides for civil penalties of up to $25,000 per violation per day of Section 313 of EPCRA ($27,500 per violation per day after

January 30, 1997 and $32,500 per violation per day after March 15, 2004, pursuant to 40 C.F.R.

Part 19).

## COUNT X – OPERATING A TSD FACILITY WITHOUT A PERMIT

255.   Paragraphs 1 through 254 are incorporated herein by reference.

256.   A waste slurry containing sodium hydroxide was generated in the Vul-Cup

Process Unit at the Franklin Plant.

257.   At times the waste slurry had a pH of greater than 12.5, and was "solid waste" and

a "hazardous waste," within the meaning of RCRA. 40 C.F.R. §§ 260.10, 261.2-.3.

258.   Pursuant to 40 C.F.R. § 261.22, the waste slurry was categorized as EPA

Hazardous Waste No. D002.

259.   Each Defendant was an "owner" or "operator" of the "facility" within the

meaning of RCRA.

260.   Each Defendant was a "generator," as defined at 40 C.F.R. § 260.10, with respect

to the waste slurry.

261.   From at least April 1, 2005 to September 22, 2008, Defendants regularly shipped

the waste slurry by rail car to an out-of-state treatment, storage, and disposal facility located in

New Jersey (the "New Jersey TSD Facility").

262.   The rail cars used to ship the waste slurry are "containers" as defined in 40 C.F.R.

§ 260.10.

263.   The New Jersey TSD Facility removed waste slurry from the rail cars by

connecting a hose and draining and/or pumping the contents of the rail car into a wastewater

treatment plant.

264.   A rail car is considered "empty" for purposes of RCRA if "[a]ll wastes have been

removed that can be removed using the practices commonly employed to remove materials from

that type of container" and "[n]o more than 2.5 centimeters (one inch) of residue remain on the bottom of the container" or "[n]o more than 0.3 percent by weight of the total capacity of the container remains in the container." 40 C.F.R. § 261.7(b)(1).

265.    On numerous occasions between April 1, 2005 and September 22, 2008, the New Jersey TSD Facility returned the rail cars to the Franklin Plant without having rendered the cars empty and without using all commonly employed means to empty them.

266.    On information and belief, the heels remaining in the railcars had characteristics similar to the original waste slurry such that the heels were still a D002-classified hazardous waste.

267.    The non-empty rail cars received from the New Jersey TSD Facility were accepted at the Franklin Plant and were not sent to another facility to finish being emptied.

268.    On many occasions between April 1, 2005 and September 22, 2008, non-empty rail cars, which contained hazardous waste, were stored on a rail siding at the Franklin Plant for less than 90 days.

269.    Pursuant to 40 C.F.R. § 270.1(b), a person may not own or operate a hazardous waste storage, treatment or disposal facility unless such person has first obtained a permit for the facility or has qualified for interim status for the facility.

270.    Pursuant to 40 C.F.R. § 262.34, a generator of hazardous waste may accumulate hazardous waste on-site for 90 days or less without a permit or without interim status, provided that the generator meets a number of conditions specified therein.

271.    On information and belief, from at least April 1, 2005 to September 22, 2008, the owners and operators of the rail siding failed to qualify for the exemption in 40 C.F.R. § 262.34.

272.    Defendants were required to obtain a TSD permit or interim status for the rail car storage area at the Franklin Plant.

273.    Defendants did not have, at any time relevant to this complaint, a TSD permit or interim status with respect to the rail car storage areas of the Franklin Plant.

274.    By owning and/or operating a container storage area at the Franklin Plant without a permit or interim status, Defendants have violated Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e), and 40 C.F.R. § 270.1(c).

275.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT XI – FAILURE TO MEET REQUIREMENTS APPLICABLE
## TO TSD FACILITIES

276.    Paragraphs 1 through 275 are incorporated by reference as if fully set forth herein.

277.    Because Defendants failed to meet the requirements set forth in 40 C.F.R. § 262.34, and were therefore required to have a permit pursuant to 40 C.F.R. § 270.1(b), Defendants were also required to meet the standards in 40 C.F.R. Part 264, which are applicable to treatment, storage, and disposal facilities that are required to have a permit. 40 C.F.R. § 262.34(b).

### Secondary Containment

278.    The non-empty rail cars contained "free liquids" within the meaning of 40 C.F.R. § 264.175(b).

36

279.    Pursuant to 40 C.F.R. § 264.175(b), a storage area for containers of hazardous wastes containing free liquids at a TSD facility must be equipped with a containment system designed and operated with a base underlying the containers that is sufficiently impervious to contain leaks, spills and precipitation. Such a containment system is required to have a storage capacity of at least ten percent of the volume of the containers or the volume of the largest container placed within the storage area, whichever is greater.

280.    The rail sidings on which the rail cars were stored did not have any containment systems.

### Weekly Inspections

281.    Pursuant to 40 C.F.R. § 264.174, owners and operators of TSD facilities must inspect the areas where containers holding hazardous waste are stored, looking for leaking containers and for deterioration of containers and the containment system caused by corrosion or other factors, on at least a weekly basis.

282.    Upon information and belief, no one conducted adequate weekly inspections of the parked rail cars as required by 40 C.F.R. § 264.174.

### Waste Analysis Plan

283.    Pursuant to 40 C.F.R. § 264.13(a), an owner or operator who treats, stores or disposes of any hazardous waste must obtain a detailed chemical and physical analysis of a representative sample of the waste.

284.    In accordance with 40 C.F.R. § 264.13(b), the owner or operator must develop and follow a written waste analysis plan describing the procedures by which the owner or operator will carry out the requirements of 40 C.F.R. § 264.13(a).

285.    Upon information and belief, no one developed an adequate waste analysis plan for the waste stored in the returned rail car storage area as required by 40 C.F.R. § 264.13(b).

37

286.    Upon information and belief, no one obtained a detailed chemical and physical analysis of a representative sample of the returned waste as required by 40 C.F.R. § 264.13(a).

### Biennial Reports

287.    Pursuant to 40 C.F.R. § 264.75, the owner or operator must prepare and submit a single copy of a biennial report to the Regional Administrator by March 1 of each even numbered year covering the facility activities during the previous calendar year.

288.    40 C.F.R. § 264.75(d) requires that the owner or operator include in the biennial report a description and the quantity of each hazardous waste the facility received during the year.

289.    40 C.F.R. § 264.75(e) requires that the owner or operator include in the biennial report the method of treatment, storage, or disposal for each hazardous waste.

290.    No one prepared or submitted a complete biennial report as required by 40 C.F.R. § 264.75 for calendar years 2005 and 2007.

### Closure Requirements

291.    Pursuant to 40 C.F.R. § 264.110, owners and operators of hazardous waste management facilities, unless otherwise provided therein, are required to comply with the requirements of 40 C.F.R. § 264.111-15.

292.    40 C.F.R. § 264.111 provides that an owner or operator must close the facility in a manner that minimizes the need for further maintenance and controls, minimizes, or eliminates, to the extent necessary to protect human health and the environment, the escape of hazardous waste, hazardous constituents, leachate, contaminated runoff or hazardous waste decomposition products to the ground or surface waters or to the atmosphere and complies with the closure requirements of, inter alia, 40 C.F.R. § 264.178.

293.   40 C.F.R. § 264.112 requires that the closure plan be in writing and outlines the steps to perform partial and/or final closure of the facility.

294.   Pursuant to 40 C.F.R. § 264.113, within 90 days after receiving the final volume of hazardous wastes or, if certain conditions are met, non-hazardous waste at a hazardous waste facility, the owner or operator must treat, remove from the unit or facility, or dispose of on-site all hazardous wastes in accordance with an approved closure plan.

295.   No one had a written closure plan for the rail car storage area.

296.   The Facility stopped receiving rail cars with sodium hydroxide hazardous waste on or around September 18, 2008.

297.   Within 90 days of September 18, 2008, the owners and operators of the Facility were required to complete closure of the rail car storage area pursuant to 40 C.F.R. § 264.113.

298.   No one completed closure of the rail car storage area within 90 days of receipt of the final volume of hazardous waste at the rail car storage area as required by 40 C.F.R. §§ 264.113.

### Financial Assurance

299.   Pursuant to 40 C.F.R. §§ 264.142-43, owners and operators of hazardous waste management facilities are required to have a detailed written estimate of the cost of closing the facility and to establish financial assurance for the closure of the facility.

300.   40 C.F.R. § 264.143 sets forth the options the owner or operator must choose from to establish financial assurance for the closure of the facility.

301.   The owners or operators must estimate the cost of closing the rail car siding at the Franklin Plant and to provide financial assurance for closure of the siding.

302.   Upon information and belief, no one estimated the cost of closure or provided financial assurance for closure of the siding, as required by 40 C.F.R. §§ 262.142-43

**Liability for the Above Acts and Omissions**

303.    By failing to comply with the applicable requirements of 40 C.F.R. Parts 264 and 265, Defendants have violated Sections 3005(a) and (e) of RCRA, 42 U.S.C. §§ 6925(a) and (e).

304.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, the United States of America, respectfully requests that the Court:

1.    Order Defendants to pay civil penalties up to the statutory maximum in the CWA, RCRA, and EPCRA;

2.    Award the United States the costs of this action; and

3.    Award other relief as this Court deems just and proper.

Respectfully Submitted,

FOR THE UNITED STATES

W. BENJAMIN FISHEROW
Acting Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

9/26/2011
Dated

DANIEL S. SMITH
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
202-305-0371 (voice)
202-616-6583 (fax)
dan.smith2@usdoj.gov


NEIL H. MACBRIDE
United States Attorney

9/29/2011
Dated

CRAIG P. WITTMAN
Assistant United States Attorney
Virginia Bar No. 39409
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - Craig.Wittman@usdoj.gov

41